1  Gary L. Eastman, Esq. (CSB #182518)
2  Tifanie H. Nelson, Esq. (CSB #286935)
   EASTMAN & MCCARTNEY LLP
3  401 West A Street, Suite 1785
   San Diego, CA 92101
4  (619) 230-1144
5
6  Attorneys for Plaintiff/Counterclaim-Defendant
   ANTHONY JOHNSON
7
8              UNITED STATES DISTRICT COURT
9         FOR THE SOUTHERN DISTRICT OF CALIFORNIA
10
11
   ANTHONY JOHNSON, an individual,      | Case No. 14-cv-1873 H (BLM)
12
              Plaintiff,                | **MEMORANDUM OF POINTS**
13                                       | **AND AUTHORITIES IN**
   v.                                    | **SUPPORT OF PLAINTIFF'S**
14                                       | **MOTION FOR SUMMARY**
   STORIX, INC., a California corporation, | **JUDGMENT**
15
              Defendant.                |
16
   AND RELATED CROSS ACTION.            | Judge:      Hon. Marilyn L. Huff
17                                       | Magistrate: Hon. Barbara Lynn Major
18
19
20
21
22
23
24
25
26
27
28

1

TABLE OF CONTENTS

I.    SUMMARY OF THE ARGUMENT ……………………………….…… 1

II.   FACTUAL BACKGROUND …………………………………………… 2

III.  SUMMARY JUDGMENT STANDARD ………………………… 9

IV.  ARGUMENT …………………………………………………… 10

A.   Storix, Inc. has Infringed Johnson's Copyright in the Original Work. …….. 10

    i.   Johnson's ownership of the copyright in the Original Work is presumed and not materially disputed. ……………………………….. 10

    ii.  Storix, Inc.'s copying and incorporation of protected elements of the Original Work in SBA version 8.2 is not materially disputed. ….. 13

B.   Storix, Inc. Has No Defense To Copyright Infringement Claims. ………… 15

    i.   Johnson did not transfer ownership of his copyright to Storix, Inc. … 15

    ii.  Johnson did not receive consideration for an irrevocable license…… 19

    iii. Storix, Inc. cannot rely on equitable estoppel in defense. …………… 23

V.   CONCLUSION ………………………………………………….. 25

TABLE OF AUTHORITIES

CASES

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ……………………….…….. 10

*Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 738 (9th Cir.2000) ……...….. 10

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ………………………. 10

*Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012) ……………………………………………………………………………….. 10

*Entertainment Research Group. Inc. v. Genesis Creative Group. Inc.,* 122 F.3d 1211, 1217 (9th Cir.1997) ...................................................................... 10

*Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 345 (1991) …………………………………………………………………………. 11

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 489 (9th Cir. 2000) …………… 11

*Woods v. Resnick*, 725 F. Supp. 2d 809 (W.D. Wis. 2010) ……………………….. 11

*Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1111 (C.D. Cal. 2010) ……………………………………………………………………. 15

*Effects Associates, Inc. v. Cohe*n, 908 F.2d 555, 557 (9th Cir. 1990) …………… 15

*Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355, 356 (9th Cir. 1994) …………………. 16

*Radio Television Espanola S.A. v. New World Entm't, Ltd*., 183 F.3d 922, 927 (9th Cir. 1999) ………………………………………………………………... 17

*Weinstein Co. v. Smokewood Entm't Group, LL*C, 664 F. Supp. 2d 332 (S.D.N.Y. 2009) …………………………………………………… …. 17, 18, 19

*Price v. Fox Entertainment Group, Inc*., 473 F. Supp. 2d 446, 460 (S.D.N.Y. 2007) …………………………………………………………..……. 18

*Tjeknavorian v. Mardirossian*, 56 F. Supp. 3d 561, 567 (S.D.N.Y. 2014) ……... 18

*Worldwide Church of God v. Philadelphia Church of God, Inc*., 227 F.3d 1110, 1114 (9th Cir. 2000) …………………………………………………… 19

*Ortiz v. Guitian Music Bros., Inc.*, No. 07 Civ. 3897, 2009 U.S. Dist. LEXIS 65191, *3 (S.D.N.Y. July 22, 2009) …………………………………… 19

*Berster Tech., LLC. v. Christmas*, No. S-11-1541 KJM JFM, 2012 U.S. Dist. LEXIS 1950, *24-*26 (E.D. Cal. Jan. 6, 2012) ………………………... 19

*Carson v. Dynegy, Inc*., 344 F.3d 446, 452 (5th Cir. 2003) …………………........ 19

*Nearstar, Inc. v. Waggoner*, 2011 U.S. Dist. LEXIS 20736, *10 (E.D. Tex. Mar. 2, 2011……….. ………………………………………… 20, 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. Cal. 1993 ...................... 21

*Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir. 1988) ............ 21

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087-1088 (9th Cir. Cal. 1989) ........ 22

*Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101,
1115 (C.D. Cal. 2010) ................................................................................. 23

OTHER AUTHORITIES

Fed.R.Civ.P. 56(a) ...................................................... 10

17 U.S.C. § 410(c) ......................................................  10

17 U.S.C. § 201(b) ...................................................... 11

17 U.S.C. 102(a) ......................................................... 13

17 U.S.C. § 101 .........................................................  14

17 U.S.C. § 204(a) ...............................................1,15,16,17,18,19

17 U.S.C. § 505 .................................................... 25

Melville B. Nimmer & David Nimmer, Nimmer on Copyright §
§ 5.03[B] (2011).......................................................... 19

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §
10.03[A][7] (Matthew Bender rev. ed. 2011)................................. 19

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §
10.02[b][5] (Matthew Bender rev. ed. 2011).................................. ........19

Cal. Civ. Code § 1605 ............................................... 20

1    Plaintiff Anthony Johnson ("Plaintiff" or "Johnson") hereby respectfully

2  submits the following Memorandum of Points and Authorities in Support of his

3  Motion for Summary Judgment on Copyright Infringement pursuant to Fed. R. Civ.

4  P. 56 against Defendant Storix, Inc. ("Defendant" or "Storix, Inc.").

## I.    SUMMARY OF THE ARGUMENT

6    In 1998, Johnson created a software application for backing up files stored on

7  user computers, sold as Storix Backup Administrator (SBA[1]).  In 1999, Johnson

8  began doing business as a sole proprietor under the fictitious name "Storix

9  Software."  In  November 1999, Johnson released the very first version of SBA,

10  version 1.3 (the "Original Work").  In December 1999, Johnson registered the same

11  with the United States Copyright Office. The copyright registered as Registration

12  No. TXu000988741 to Anthony Johnson dba Storix Software.  Over the next few

13  years, Johnson prepared various derivative works based upon the Original Work,

   which were marketed and sold by Johnson's company Storix Software.

14    In January 2003, Johnson formed Storix, Inc. to continue his business of

15  developing and selling SBA.  Johnson transferred the cash assets from his sole

16  proprietorship and the tangible assets, such as computers, desks, office supplies, and

17  the like to Storix, Inc. to enable Storix, Inc. to begin doing business.  Johnson never

18  intended to transfer, and never did transfer, ownership of his registered copyright to

19  Storix, Inc.  Storix, Inc. has not produced any document that satisfies the writing

20  requirement for transfer of copyright ownership pursuant to§ 204(a).  Consequently,

21  by operation of law, any grant of copyright rights between Johnson and Storix, Inc.

22  concerning the Original Work must be, at most, an implied, non-exclusive license.

23  However, even if Storix, Inc. can prove it has an implied, non-exclusive license to

24  the Original Work, the implied license is revocable at the discretion of Johnson

25  because he did not receive any consideration for it.  Johnson revoked any such

26  implied license in July 2014.  Notwithstanding Johnson's express revocation of

27  _____

[1] "SBA" will refer to all versions of the software, including versions known as
28  "Backup Administrator for AIX," Storix System Backup Administrator," and "Storix
   Backup Administrator."

rights, Storix, Inc. continued preparing and releasing the infringing derivative works. This amounts to willful copyright infringement.

Derivative works published by Storix, Inc., which incorporate copyrighted material from the Original Work, infringe Johnson's copyright rights in the Original Work. Storix, Inc. has raised various meritless theories why its continued use of the copyrighted materials from the Original Work does not infringe Johnson's copyright rights. Based upon the material facts of this case that are not in genuine dispute, summary judgment on copyright infringement is appropriate as a matter of law.

## II.    FACTUAL BACKGROUND

SBA is a software application for backing up files stored on user computers. (Ex. 2 to Decl. Edwards, at ¶ 23.) Johnson created the first version of SBA in 1998. (Ex. 2 to Decl. Edwards, at ¶ 24.)   At this time, Johnson was a sole proprietor doing business as Storix Software. (Ex. 1 to Decl. Eastman, Johnson Deposition, 33: 2-14; Ex. 2 to Decl. Eastman; Ex. 3 to Decl. Eastman.) On December 10, 1998, Johnson applied to register the trademark "STORIX SOFTWARE" with the United States Trademark Office. (Ex. 4 to Decl. Eastman .) The trademark registered on June 18, 2002 as Trademark Registration No. 2,528,677 to Anthony Johnson dba Storix Software. (Ex. 4 to Decl. Eastman.) In late 1999, Johnson released SBA version 1.3 and registered the same with the United States Copyright Office. (Ex. 5 to Decl. Eastman,; Ex. 6 to Decl. Eastman, Frederiksen-Cross report at ¶ 13.) The copyright registered as Registration No. TXu000988741 to Anthony Johnson dba Storix Software. (Ex. 5 to Decl. Eastman.) By December 2002, Johnson had prepared and sold derivative works SBA versions 2.1 through 4.1. (Ex. 6 to Decl. Eastman, Frederiksen-Cross report at ¶ 13; Ex. 7 to Decl. Eastman, Huffman Dep. Tr., Vol. 1, at 27:5 through 29: 4; 34:6-10; 54:4-25; 60:2-11.)

In January 2003, Johnson formed Storix, Inc. as a vehicle to continue selling his SBA software. (Ex. 8 to Decl. Eastman;  Ex. 7 to Decl. Eastman, Huffman Dep. Tr., Vol. 1, at 61:21through 62: 6.) Upon its inception in 2003, Storix, Inc. authorized 25,000 shares. (Ex. 8 to Decl. Eastman.) Johnson purchased 1,000 shares

at $1.00 par value.  (Ex. 9 to Decl. Eastman, at JOHNSON001725 and JOHNSON001727.)  This $1 par value ascribed to the stock is commonplace for transactions like this where the purchaser of stock is a related party (Johnson owned 100% of the issued stock).  (Ex. 3 to Decl. Taylor, at p. 2.)  Storix, Inc.'s accounting records reflect that the value ascribed to the stock issued to Johnson in 2003 was $1,000—an amount which is the difference between the cash transferred to Storix, Inc. (an asset) and the note payable to Johnson by Storix, Inc. (a liability).  (Ex. 3 to Decl. Taylor, at p. 2.) The book value ascribed to Johnson's stock does not include any "copyright" or "software" value.  (Ex. 3 to Decl. Taylor, at p. 2.)

Also at the time of formation, Johnson transferred to Storix, Inc. the assets that he deemed necessary for the corporation to run the business, such as cash, as well as tangible items such as computers, desks, and other miscellaneous office supplies that he donated to the corporation.  (Ex. 3 to Decl. Eastman; Ex. 1 to Decl. Eastman, Johnson Dep. Tr., Vol. 1, at 174: 7 through 176: 23; 188: 22 through 189: 9.) Johnson did not, however, transfer his intellectual property assets to Storix, Inc. at the time of formation. (Ex. 1 to Decl. Eastman, Johnson Dep. Tr., Vol. 1, at 181: 24 through 182: 7; 183: 19-25.)

In 2006—three years after Johnson formed Storix, Inc.—Johnson assigned his trademark for "STORIX SOFTWARE" to Storix, Inc.  (Ex. 10 to Decl. Eastman.) With respect to his registered copyright for the Original Work, this was never assigned or otherwise transferred to Storix, Inc.  Rather, Johnson intentionally maintained this intellectual property as his own, even devising the copyright in his estate plan prepared long before this controversy existed.  (Ex. 1 to Decl. Eastman, Johnson Dep. Tr., Vol. 1, at 183: 19-25; 233: 7-11; see also, 199: 4-24; 233: 18 through 234: 3; Ex. 11 to Decl. Eastman.)

There is no writing signed by Johnson that identifies a transfer of copyright ownership.  There is no written agreement addressing a transfer of any copyright rights from Johnson to Storix, Inc. in connection with the formation of Storix, Inc. [2]

---

[2] (Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 168:19 through 169:4; Ex. 12 to Decl. Eastman, Altamirano Dep. Tr., at 85: 2-13; Ex. 15 to Decl. Eastman,

There is no written agreement addressing a license to Storix, Inc. for the use of Johnson's copyrighted materials from the Original Work.[3]  There is no evidence of an oral agreement between Johnson and Storix, Inc. regarding a transfer of ownership, or license to use, Johnson's copyrighted Original Work.

The Storix, Inc. accounting records do not reflect any transfer of copyright from Johnson to the company.  (Ex. 16 to Decl. Eastman, Bergmark report at p. 6.) Rather, the only asset recorded in Storix, Inc.'s QuickBook accounting records at the time of formation was cash totaling $137,987.72.  (Ex. 2 to Decl. Taylor, at p. 2; Ex. 3 to Decl. Taylor, at p. 2 and at Ex. 2; Ex. 16 to Decl. Eastman, Bergmark report at p. 6 [agreeing that the only asset recorded on the books of Storix, Inc. which was transferred from Storix Software was cash].)  In exchange for this cash, Storix, Inc. issued a note payable to Johnson in the amount of $137,191.27.  (Ex. 2 to Decl. Taylor, at p. 2 and at Ex. 2; Ex. 3 to Decl. Eastman; Ex. 1 to Decl. Eastman, Johnson Dep. Tr., Vol. 1, at 177: 1 through 181: 12.)  Additionally, Storix, Inc.'s 2003 U.S. Income Tax Return does not reference "copyright" or "software" as an asset on its 2003 year-end balance sheet.  (Ex. 3 to Decl. Taylor, at p. 2 and at Ex. 3.)

Johnson did not receive any consideration from Storix, Inc. for the use of his copyrighted materials.  (Ex. 2 to Decl. Taylor, at p. 2; Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 169:11-19; Ex. 13 to Decl. Eastman, Turner Dep. Tr., Vol. 2, at 109: 6-11; Ex. 16 to Decl. Eastman, Bergmark report at p. 6 ["No license fees or other use fees were identified as being paid for the use of the Software."] and at p. 8 ["[T]here is no indication that [Johnson] received a royalty or other separate compensation for the Company's use of the license."].)  The Storix, Inc. accounting records do not reflect any consideration Johnson received from Storix, Inc. for its use of Johnson's copyrighted materials. (Ex. 3 to Decl. Taylor, at pp. 2-3.)

---

Kinney Dep. Tr., 119:  21-23; Ex. 13 to Decl. Eastman. Turner Dep. Tr., Vol. 2, at 194: 5 through 195: 13.)
[3] .  (Ex. 14 to Decl. Eastman, Huffman Dep. Tr., vol. 2, 169:5-9; Ex. 12 to Decl. Eastman, Altamirano Dep. Tr., at 85:14-16; Ex. 15 to Decl. Eastman, Kinney Dep. Tr., at 119: 24 through 120: 15; Ex. 13 to Decl. Eastman. Turner Dep. Tr., Vol. 2, at 195: 15 through 197: 3.)

From the date of incorporation in January 2003 until June 2011, Johnson was the president, sole director, and sole shareholder of Storix, Inc.[4]  During this time, Johnson exclusively managed and controlled the business of Storix, Inc. and directly oversaw every employee.[5]   Further, from January 2003 until June 2011, Johnson exclusively managed and controlled the design and development of SBA.[6]   By June 2011, Storix, Inc. had released SBA versions 5.1, 5.2, 5.3, 6.1, 6.2, 6.3, 7.1, and 7.2. (Ex. 6 to Decl. Eastman, Frederiksen-Cross report at ¶ 13; Ex. 2 to Decl. Edwards, at ¶ 24.)

At any given point from 2003 through June 2011, Johnson, as the president, sole director, and sole shareholder of Storix, Inc., had the right to close the business, sell the business, sell his registered copyright to a third-party, license his registered copyright to a third-party, or basically do whatever else he wanted with his company and his registered copyright.  (Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 270: 6-12.)  In June 2011 Johnson contemplated selling the business to a third party, Acronis, Inc.  (Ex. 25 to Decl. Eastman.)  However, none of Johnson's discussions with Acronis, Inc. transpired past the preliminary stage or otherwise included a discussion as to the specific assets that would be included in a potential purchase of Storix, Inc.  (Ex. 1 to Decl. Eastman, Johnson Dep. Tr., Vol. 1, att 267: 2-9.) Johnson never even discussed with Acronis, Inc., let alone negotiated, a purchase price that would account for the value of his registered copyright.   (Ex. 1 to Decl. Eastman, Johnson Dep. Tr., Vol. 1, at 267: 11 through 268: 8.)

In June 2011, Johnson's employee, David Huffman, informed Johnson that he would be resigning so that he could finish school and get his bachelor's degree.  (Ex. 26 to Decl. Eastman, STORIX102762; Ex. 13 to Decl. Eastman, Turner Dep. Tr.,

---

[4] (Ex. 3 to Decl. Eastman; Ex. 17 to Decl. Eastman; Ex. 18 to Decl. Eastman; Ex. 19 to Decl. Eastman; Ex. 20 to Decl. Eastman; Ex. 21 to Decl. Eastman; Ex. 22 to Decl. Eastman; Ex. 23 to Decl. Eastman.)
[5] (Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 269: 23 through 270: 12; Ex. 15 to Decl. Eastman,  Kinney Dep. Tr., Vol. 1, at 103: 25 through 104: 8.)
[6] (Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 235:6-20; 236:13 through 237:14; 239:19 through 240:15; Ex. 15 to Decl. Eastman,  Kinney Dep. Tr., Vol. 1, at 104: 9-18.)

Vol. 2, at 142: 17-21; 143: 19 through 144: 9.)  A few days prior to Huffman's announcement Johnson was diagnosed with late-stage cancer.  (Ex. 1 to Decl. Eastman, Johnson Dep. Tr., Vol. 1, at 46: 10-18; 262: 2-6.)

Not knowing when, if ever, he would be able to return to the company, and believing that Huffman was a loyal and trustworthy employee, Johnson decided that he would step down from president and allow Huffman to fill that role during his medical leave.  (Ex. 1 to Decl. Eastman, Johnson Dep. Tr., Vol. 1, at 46:10 through 47: 6.)  Additionally, Johnson decided that he would give certain long-time employees substantial stock in the company as a gift prior to his going on medical leave.  Specifically, Johnson transferred, at no cost to the employees, 60% of the outstanding stock to Huffman, Manuel Altamirano, David Kinney, and Richard Turner, thereby reducing his ownership in the company to 40%.  (Ex. 2 to Decl. Taylor, Report, at p. 2; Ex. 24 to Decl. Eastman; Ex. 27 to Decl. Eastman; Ex. 28 to Decl. Eastman; Ex. 29 to Decl. Eastman; Ex. 30 to Decl. Eastman; Ex. 16 to Decl. Eastman, Bergmark report, at p. 3.)

Consistent with Johnson's intention of transferring these shares as a gift to the four employees, Johnson also decided that the company would loan Huffman, Altamirano, Kinney, and Turner the funds to pay the resulting income tax on their acquisition of shares.  (Ex. 2 to Decl. Taylor, at p. 2; Ex. 3 to Decl. Taylor, at pp. 2-3; Ex. 31 to Decl. Eastman; Ex. 32 to Decl. Eastman; Ex. 33 to Decl. Eastman; Ex. 34 to Decl. Eastman; Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, 171:14-18; 172:10-12; 173: 3-9; 259:12-14.)  The tax basis used in connection with the transfer of shares was based on a discounted value of Storix, Inc.'s equity as of September 21, 2011, which was $937,500.  (Ex. 3 to Decl. Taylor, at p. 2 and at Ex. 4.)  The shareholders' equity as of December 31, 2010 and 2011, was $816,990 and $841,214, respectively, which primarily consisted of cash and accounts receivable. (Ex. 3 to Decl. Taylor, at p. 3 and at Ex. 5.)  Storix, Inc.'s accrual-based balance sheets indicates that the majority of the value ascribed to the stock transferred to the four employees in September 2011 was based on Storix, Inc.'s net tangible assets,

not intellectual property such as Johnson's copyright.   (Ex. 3 to Decl. Taylor, at p. 3.)  There is no evidence to the contrary.

The 2011 stock transfer transaction did not include or coincide with any writing signed by Johnson transferring his copyright ownership to Storix, Inc. or licensing his copyrighted materials to Storix, Inc.  (Ex. 12 to Decl. Eastman, Altamirano Dep. Tr., Vol. 1, at 81: 12 through 83: 7; Ex. 3 to Decl. Taylor, at pp. 2-3.)  Nor was there any oral agreement regarding a transfer of ownership of, or license to use, Johnson's copyrighted materials in the Original Work.   (Ex. 12 to Decl. Eastman, Altamirano Dep. Tr., Vol. 1, at 84: 2-16; 86: 15-23.)

While on medical leave, Johnson continued to contribute to the software development and overall business of Storix, Inc.    (Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 238: 11 through 239: 18; Ex. 35 to Decl. Eastman.) When Johnson returned to work full time with a clean bill of health in 2013, Johnson began research into a large "network security" project in furtherance of the company's plan to expand into "cloud computing" or "remote backup site" environments and develop a new version of the software, version 9.1, that included enhanced network security features.  (Ex. 1 to Decl. Eastman,  Johnson Dep. Tr., Vol. 1, at 106: 8 through 107: 5; Ex. 36 to Decl. Eastman.)   Johnson worked by himself, without any other involvement from anyone else, to research, test, and develop version 9.1.  (Ex. 1 to Decl. Eastman,  Johnson Dep. Tr., Vol. 1, at 60: 13-20.)  While Johnson worked on version 9.1, the other Storix, Inc. development staff worked concurrently on SBA version 8.2.  (Ex. 1 to Decl. Eastman,  Johnson Dep. Tr., Vol. 1, at 60: 13-20;  Ex. 37 to Decl. Eastman.)

The features Johnson developed during this time period were critical to SBA to address major security threats when used in a wide-area-network environment. (Ex. 36 to Decl. Eastman, at STORIX231287 [recognizing that the current software (SBA version 8.2) is vulnerable to network security threats and that fundamental changes need to be implemented to enhance the network security of the product]; Ex. 15 to Decl. Eastman,  Kinney Dep. Tr., Vol. 1, at 114: 11-13; Ex. 38 to Decl.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(CASE NO. 14-CV-1873 H (BLM))

7

Eastman, Hawkins Dep. Tr., Vol. 1, at 91: 2 through 92: 16.)  However, without any reasonable inquiry, investigation, testing, or otherwise independent analysis of Johnson's work, the board members rejected and refused to implement any such network security features, claiming they were not necessary.  (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr.,Vol. 2, at 253:2 through 254:3.)  When Johnson tried to exercise his right, as the owner of the Original Work, to control the design of the derivative works, the other Storix, Inc. board members denied him such right, claiming that Johnson was no longer "in a management position."  (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, at 253: 8 through 254: 3; 265:4 through 266:13; 268:15-24.)

By mid-2014, it became clear to Johnson that the other Storix, Inc. board members were making decisions that jeopardized the value of his Original Work and were inconsistent with his rights as the sole author and owner of the Original Work. (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, at 251:1-19; 253:2 through 254:3; 255: 14-22; 265:4 through 266:13; 268:15-24.)  On May 8, 2014, Johnson resigned from Storix.  (Ex. 39 to Decl. Eastman.)   Johnson went to great lengths to explain to the other Storix, Inc. board members/employees why he was resigning, i.e., the mismanagement and neglect of the software, and to explain what needed to be done to protect the integrity of his software and the future of the business.  (Ex. 40 to Decl. Eastman; Ex. 41 to Decl. Eastman.)  Johnson also went to great lengths to try to informally resolve the matter without having to resort to legal action.  (Ex. 42 to Decl. Eastman; (Ex. 43 to Decl. Eastman.)  Johnson explained to the board members that he is the owner of the copyright, that he never transferred the copyright to Storix, Inc., that he never received consideration for any license of copyright, and that Storix, Inc. no longer has any permission to continue to use his copyrighted materials from the Original Work to create new derivative works.  (Ex. 42 to Decl. Eastman.)  The Storix, Inc. board members, however, refused to respond to Johnson or otherwise address Johnson's concerns.

Thus, with no other option, Johnson was forced to take formal action.  On July

22, 2014, Johnson, through his attorney, sent Storix a letter notifying Storix, Inc. that Johnson is the sole owner of the Original Work and that Storix, Inc.'s continued use of protected elements from the Original Work to create, market, and sell subsequent versions of SBA amounts to copyright infringement.  (Ex. 44 to Decl. Eastman.)  A few days later Storix, Inc. responded by denying any infringement and claiming that Storix, Inc. owned all versions of the software, including the versions Johnson developed and released *prior to* the formation of Storix, Inc. (Ex. 45 to Decl. Eastman.)  Johnson commenced litigation shortly thereafter asserting his copyright ownership.  (Doc. No. 1.)

Storix, Inc. has continued to intentionally disregard and infringe Johnson's copyright rights by preparing and selling derivative works that incorporate Johnson's copyrighted material from the Original Work.  At the time of Johnson's revocation of rights, the current version of the software product was SBA version 8.2.  Since revocation, Storix, Inc. has released the following infringing derivative works: SBA version 8.2.1.0 (released on August 26, 2014);SBA version 8.2.1.1 (released on October 1, 2014), SBA version 8.2.1.2 (released on October 22, 2014), SBA version 8.2.1.3 (released on November 21, 2014), SBA version 8.2.2.0 (released on February 26, 2015), SBA version 8.2.3.0 (released on April 13, 2015), SBA version 8.2.3.1 (released on August 13, 2015), and SBA version 8.2.4.0 (released on September 24, 2015) (collectively, referred to herein as SBA version 8.2).   (Ex.s 46, 47, and 48 to Decl. Eastman.)  These infringing works are essentially the same as SBA version 8.2, representing simple fixes to correct mistakes or eliminate any bugs found in version 8.2, and to add additional support features for version 8.2. (Ex.s 46, 47, and 48 to Decl. Eastman.)  Additionally, Storix, Inc. is in the process of preparing another infringing derivative work, SBA version 9.1, which it hopes to release by the end of 2015.  (Ex. 38 to Decl. Eastman, Hawkins Dep. Tr., Vol. 1, at 92: 23 through 93: 14.)

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other

materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  (Fed.R.Civ.P. 56(a).) On those issues for which it bears the burden of proof, the moving party must show the absence of any genuine issue of material fact. (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).) To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact.  (*Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir.2000).)  A "material fact" is a fact "that might affect the outcome of the suit under the governing law." (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).) A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (*Liberty Lobby,* 477 U.S. at 248.)  The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party.  (*See id.* at 252.)

## IV.   ARGUMENT

## A.   Storix, Inc. has Infringed Johnson's Copyright in the Original Work.

A *prima facie* claim for copyright infringement has two basic elements: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.  (*Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012).  There is no genuine dispute that these elements are met.

### i.   Johnson's ownership of the copyright in the Original Work is presumed and not materially disputed.

Johnson owns a copyright registration certification for the Original Work, which he obtained within five years of the first publication of the Original Work. (Ex. 5 to Decl. Eastman.)  Pursuant to 17 U.S.C. § 410(c), the copyright registration certificate is *prima facie* evidence of the validity of the copyright and the facts stated therein. "A certificate of copyright registration shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights."  (*Entertainment Research Group. Inc. v. Genesis Creative Group. Inc.,* 122 F.3d 1211, 1217 (9th Cir.1997).)

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(CASE NO. 14-CV-1873 H (BLM))

10

Proving the invalidity of a copyright by showing the work is unoriginal is a difficult task because 17 U.S.C. 102(a) requires "only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least a minimal degree of creativity." (*Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 345 (1991).)  In the Ninth Circuit, "the definition of originality is broad:  All that is needed . . . is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'" (*Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 489 (9th Cir. 2000) (citation and some internal quote marks omitted).)

Storix, Inc. has not produced any evidence to establish the invalidity of Johnson's copyright.  There is no evidence that Johnson is not the sole author of the Original Work.  (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, at pp. 261-264.)  Storix, Inc. does not have any authorship claim in the Original Work under 17 U.S.C. § 201(b).  Under the work-for-hire doctrine, a company or other person for whom a work was prepared may be considered the author of the work.  (*See* 17 U.S.C. § 201(b).)  However, in this case, Johnson created, published, and registered the Original Work more than four years before he even formed Storix, Inc.

Moreover, from formation in 2003 until September 2011, Johnson was not an employee of Storix, Inc.  *Woods v. Resnick*, 725 F. Supp. 2d 809 (W.D. Wis. 2010) ("*Woods*") is instructive here.  In *Woods*, the court concluded that an equal partner in a limited liability company was not an employee under the work-for-hire doctrine.  The LLC in Woods required unanimous consent before any action could be taken.  "In other words, the company does not have the ability to compel either owner to take action.  Under this scenario, there is no basis for finding that [the plaintiff] was an employee under the control of [the defendant]." Id. at 824.  The facts here are even stronger than they were in *Woods*.  Johnson formed a corporation; not an equal partnership LLC.  Johnson was the president, sole director, and sole shareholder from the time of formation in January 2003 until September 2011 with the exclusive right to control and manage the software and the business as he saw fit.  Storix, Inc.

did not have the ability to compel Johnson to take action.  Thus, Storix, Inc. cannot claim ownership to the Original Work under the work-for-hire doctrine.

The Original Work contains numerous design decisions that constitute the architecture of the Original Work.  (Ex. 2 to Decl. Edwards, at ¶ 39.)  The architecture of a software system consists of the set of principle design decisions that govern its structure and behavior.  (Ex. 2 to Decl. Edwards, at ¶ 39.)  The principle design decisions are those decisions that most profoundly affect the quality and capabilities of the system. (Ex. 2 to Decl. Edwards, at ¶ 39.)  Some of the design decisions forming the architecture of the Original Work include: clients, backup servers, and a single admin system, which are connected over a network; clients may back up files by transmitting data over the network to backup servers; client files are backed up when the user creates, schedules and runs backup jobs; each back up job is initially configured using settings from a backup profile; each backup media device has an associated job queue, etc. (Ex. 2 to Decl. Edwards, at ¶ 40.)  It is the unique combination of the design decisions made by Johnson, which considered as a whole, make the Original Work original.  (Ex. 2 to Decl. Edwards, at ¶ 42.)  The fact that the Original Work, like most software applications, consists of both original, proprietary source code and third-party and open-source libraries is of no consequence.  (Ex. 3 to Decl. Edwards, at ¶ 3.)  Every version of the SBA software, from version 1.3 through version 8.2, contains third-party and open-source libraries. (Ex. 3 to Decl. Edwards, at ¶ 5; Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, at 205: 9-25; 207: 11-20.)  In fact, the later versions of SBA actually contain more third-party components than the early versions of SBA.  (Ex. 3 to Decl. Edwards, at ¶ 5.)

There is no triable issue of fact that Johnson is the author of the Original Work and that he contributed something more than a merely trivial variation.  These creative efforts were recognizably his own thus satisfying the originality requirement under 17 U.S.C. 102(a).

ii.     **Storix, Inc.'s copying and incorporation of protected elements of the Original Work in SBA version 8.2 is not materially disputed.**

There is no genuine dispute that the Storix, Inc. employees had access to Johnson's copyrighted materials from the Original Work.  Storix, Inc. used the same office, same computers, same desks, same file cabinets, same equipment, same employees, etc. as Johnson's sole proprietorship.   (Ex. 7 to Decl. Eastman, Huffman Dep. Tr., Vol. 1, at 61: 21 through 62: 18.) [7]   As employees of Storix Software, and product managers of Storix, Inc., Huffman and Turner were personally familiar with the design and function of the pre-Storix, Inc. versions of SBA and had access to the digital code repository tracking the development of the software over the years. [8]

There is no genuine dispute that the software prepared, released, and sold by Storix, Inc. includes verbatim copies of protected elements from the Original Work. SBA has *never* undergone a ground-up, start-from-scratch redesign. (Ex. 2 to Decl. Edwards, at ¶ 26.)  There has never been a wholesale discarding of a prior version and a brand-new rewrite of a new version.  (Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 185: 21 through 186: 16.)  Rather, every version of SBA was created by using the previous version as a starting point and building on top of it. (Ex. 2 to Decl. Edwards, at ¶ 26.)

All subsequent versions of SBA from version 2.0 through version 8.2 literally incorporate concrete, expressive elements of the Original Work, including source

---

[7] Huffman began working for Johnson in 2002 as an employee of Johnson's sole proprietorship.  (Ex. 7 to Decl. Eastman, Huffman Dep. Tr., Vol. 1, at 18: 21-25.) Huffman is currently the president and product manager of Storix, Inc.  (Ex. 7 to Decl. Eastman, Huffman Dep. Tr., Vol. 1, at 5: 14-17.)  Turner also began working for Johnson back in 2002 as an employee of Johnson's sole proprietorship.  (Ex. 7 to Decl. Eastman, Huffman Dep. Tr., Vol. 1, at 63: 13-17; 64: 19 through 65: 8; Ex. 49 to Decl. Eastman, Turner Dep. Tr., Vol. 1, at 22: 1 through 23: 2; 59: 9-11.)  Turner was the product manager of Storix, Inc. from 2008 through 2014 and possibly into 2015.  (Ex. 49 to Decl. Eastman, Turner Dep. Tr., Vol. 1, at 73: 1-19; 75: 23-25.)
[8] (Ex. 7 to Decl. Eastman, Huffman Dep. Tr., Vol. 1, at 17: 19 through 18: 20; 19: 16 through 24; 23: 10 through  26: 14; 46: 7 through 47: 25; 52: 12 through 53: 11;  54: 4-25; 56: 20 through 57: 13; Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 109: 2-22; 126: 1 through 127: 12; 139: 19-20; pp. 219-220; Ex. 15 to Decl. Eastman, Kinney Dep. Tr., Vol. 1, at 24: 14-22; 25: 13-25; 35: 2-19; 37: 1-18.)

code, design structures, and user interfaces.  (Ex. 2 to Decl. Edwards, at ¶ 83; Specific comparison at ¶81).   Additionally, there is no genuine dispute that every version of SBA from version 2.0 to 8.2 is, in fact, a derivative work of the Original Work (SBA version 1.3).  (Ex. 2 to Decl. Edwards, at ¶ 25, 26; Specific comparison at ¶82)

Even if one were to accept the premise that SBA version 8.2 is not directly derived from the Original Work (version 1.3), SBA version 8.2 (and every preceding version) is still a derivative work of the Original Work because of its unbroken line of derivative ancestors leading back to the Original Work.  (Ex. 2 to Decl. Edwards, at ¶ 82; *see* 17 U.S.C. § 101 (defining a "derivative work" in part as: "a work based upon one or more pre-existing works . . . .").)  The Original Work (version 1.3) provided the foundation and nucleus of all subsequent versions of SBA and the "DNA" of version 1.3 is pervasive an every later version.  (Ex. 2 to Decl. Edwards, at ¶ 37.)  All versions of SBA are distributed as an integrated unit that includes the code, design, and interfaces of version 1.3.  (Ex. 2 to Decl. Edwards, at ¶ 37.)  Enhancements to SBA made after version 1.3 are inextricably linked with the code and design inherited from version 1.3.  (Ex. 2 to Decl. Edwards, at ¶ 37.)  These later enhancements are not independent or separate modules (such as add-ons or plug-ins). Rather, they are an evolution of version 1.3 itself.  (Ex. 2 to Decl. Edwards, at ¶ 37.)

Accordingly, there is no genuine dispute that SBA version 8.2 (including SBA version 8.2.2.0 and version 8.2.4.0)  incorporates copyrighted material from the Original Work.  (Ex. 2 to Decl. Edwards, at ¶ 25, 26, 81, 83.)  This fact is most readily illustrated by the main SBA user interface, which is essentially unchanged between the earliest version of SBA, version 1.3 (the Original Work), and the latest version of SBA, version 8.2.  (Ex. 2 to Decl. Edwards, at ¶ 25; see also, Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, at 146: 4-22.)   (See Ex. 2 to Decl. Edwards, at Figures 1-16 and Ex.s 3, 4, and 6.)  A work is a derivative work only if it would be considered to infringe upon the original work from which it is derived. (*See* 1 NIMMER ON COPYRIGHT § 5.03[B] (2011) ("[A] work will be considered a

derivative work only if it would be considered an infringing work if the material which it has derived from a pre-existing work had been taken without the consent of a copyright proprietor of such pre-existing work."); *see also Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343 (9th Cir. 1988).)  Storix, Inc. has not produced any evidence establishing that SBA version 8.2 is not a derivative work of Johnson's Original Work.   Indeed, Storix, Inc. has not even compared the content of SBA version 1.3 (the Original Work) to the latest version of SBA, version 8.2.  (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, at 143: 22 through 144: 4.)

Based on the above, there is no genuine dispute that SBA version 8.2 (including , SBA version 8.2.2.0 and version 8.2.4.0) is a derivative work that necessarily incorporates protected elements of the Original Work and therefore, infringes Johnson's copyright rights.  In denying Johnson the right to control the use and manner in which his copyrighted materials from the Original Work are used, Storix, Inc. deprived Johnson of his exclusive right to control and manage the use of his copyrighted materials from the Original Work.

**B.   Storix, Inc. Has No Defense To Copyright Infringement Claims.**

**i.   Johnson did not transfer ownership of his copyright to Storix, Inc.**

One of Storix, Inc.'s claimed defenses to copyright infringement is that Johnson allegedly transferred ownership of his copyright to Storix, Inc.  This argument has no merit.  It is a fundamental tenant of copyright law that a transfer of copyright ownership must be made in writing.  Under 17 U.S.C. § 204(a):

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

The writing requirement "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price."  (*Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1111 (C.D. Cal. 2010) (quoting *Effects Associates, Inc. v. Cohe*n, 908 F.2d

555, 557 (9th Cir. 1990).)  Furthermore, the writing requirement "not only protects authors from fraudulent claims, but also enhances predictability and certainty of ownership—Congress's paramount goal when it revised the [Copyright] Act in 1976."  (*Id.*)  As the Ninth Circuit has explained, Section 204(a)'s "requirement is not unduly burdensome … The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so."  (*Effects Associates, Inc. v. Cohe*n, 908 F.2d at 557; *Konigsberg Int'l, Inc. v. Rice*, 16 F.3d 355, 356 (9th Cir. 1994) ("[A] transfer of copyright is simply not valid without a writing."); *Radio Television Espanola S.A. v. New World Entm't, Ltd*., 183 F.3d 922, 927 (9th Cir. 1999).)

"A writing evidencing the transfer of copyright ownership need not be lengthy or detailed, but it must evidence the transfer with reasonable clarity."  (*Weinstein Co. v. Smokewood Entm't Group, LL*C, 664 F. Supp. 2d 332 (S.D.N.Y. 2009).)  The "intention of a copyright owner seeking to transfer an ownership interest must be *clear and unequivocal*."  (*Id*. at 341 (emphasis added).)  "The purpose of the signed writing requirement is to ensure that the copyright owner deliberately transfers is ownership interest and that the owner does so in way that provides the parties with a clear guide to their rights and responsibilities."  (*Id*., citing *Effects Asso*ciates, 908 F.2d at 557).)

Storix, Inc. points to a single, statement Johnson included in the Storix, Inc. 2003 Annual Report, stating: "All assets from Storix Software were transferred to Storix, Inc. as of its incorporation of February 24, 2003."  (Ex. 3 to Decl. Eastman.) However, the Storix, Inc. 2003 Annual Report does not contain any terms clearly identifying the terms of any transfer deal between Johnson and Storix, Inc.  Contrary to Storix, Inc.'s argument, that single statement is not sufficient to satisfy the writing requirements for transfer of copyright ownership under 17 U.S.C. § 204(a).

Further, there is evidence directly contradicting Storix, Inc.'s argument that the phrase "all assets" used by Johnson in the 2003 Annual Report for Storix, Inc. is proof that Johnson transferred ownership of his copyright rights to the Original Work

at the time of formation.   For example, Johnson owned the registered trademark for "Storix Software" at the time he wrote the 2003 Annual Report.  Yet, Johnson did not assign or transfer his ownership of the registered trademark to Storix, Inc. until three years later in 2006.  (Ex. 4 to Decl. Eastman.)  This clearly demonstrates that the phrase "all assets" in the 2003 Annual Report for Storix, Inc. did not refer to or otherwise include every single asset owned by Johnson that he used in connection with his sole proprietorship.  If the phrase "all assets" did not include Johnson's registered trademark, then it is not reasonable to assume that it included Johnson's other intellectual property assets either, i.e., his registered copyright.

Aside from the 2003 Annual Report, Storix, Inc. points to various general business documents to support its claim that Johnson transferred ownership of his copyright to Storix, Inc.  For example, when Huffman, who began working for Johnson back in 2002, prior to the formation of Storix, Inc., and is now currently the current president of Storix, Inc., was asked during his deposition what documents he has seen that would constitute a transfer of copyright ownership, he responded: "[t]he code was changed to note Storix, Inc. as the copyright," "the website was changed to Storix, Inc.," and "the employees began getting paid by Storix, Inc."  (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2,  at 269: 8-22.)  Additionally, Storix, Inc. points to third-party service agreements Storix, Inc. entered into, which were signed by Johnson, indicating that Storix, Inc. was the owner of the software.  (Ex. 12 to Decl. Eastman,  Altamirano Dep. Tr., Vol. 1, at 87: 15-25.)  However, none of these documents clearly evince the intent of Johnson to transfer copyright.

Storix, Inc. has failed to produce the existence of a writing that satisfies the requirements of § 204(a).[9]  Neither the 2003 Annual Report, the Storix, Inc. copyright notices, the name change on the website, the third-party service agreements, or anything else, demonstrate a clear and unequivocal statement of intent by Johnson to transfer ownership of or an exclusive right to his copyrighted

_____

[9] (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, at 169:5-9; 266: 15-23; 269: 5-22; Ex. 13 to Decl. Eastman,  Turner Dep. Tr., Vol. 2, at 194: 5 through 196: 21; Ex. 12 to Decl. Eastman,  Altamirano Dep. Tr., Vol. 1, at 85: 2-15; Ex. 15 to Decl. Eastman, Kinney Dep. Tr., at 119: 24 through 120: 15.)

materials to Storix, Inc. As such, these documents are insufficient to constitute a valid transfer of copyright ownership under § 204(a).  (*See Woods*, 725 F. Supp. at 826 (while the service agreement signed by Woods and Copyright Notice paragraph included in the terms and conditions of the service agreement, which Woods was involved in drafting and reviewing, "could be viewed as circumstantial admissions by Woods, neither is an actual assignment of the copyright."); see also,  *Price v. Fox Entertainment Group, Inc*., 473 F. Supp. 2d 446, 460 (S.D.N.Y. 2007) (mere existence of partnership and its supporting documents and certificates did not satisfy § 204(a) because "those documents by their terms do not transfer the copyright itself"); *Weinstein Co. v. Smokewood Entm't Group, LLC*, 664 F. Supp. 2d 332, 341 (S.D.N.Y. 2009) ("[P]laintiff has failed to allege the existence of a writing that satisfies the requirements of § 204(a).  Neither of the e-mails sent by Walker on the evening of January 27th demonstrates a clear statement of intent to transfer an exclusive right in Push."); *Tjeknavorian v. Mardirossian*, 56 F. Supp. 3d 561, 567 (S.D.N.Y. 2014) ("Ultimately, a writing does not have to be long — it need not exceed "a one-line pro forma statement." But there is one thing it absolutely must be, and that is "clear." Mardirossian has pointed to no email, or other correspondence, that clearly evinces the intent to transfer copyright. Therefore, the Tjeknavorians are entitled to the declaration they seek.").)

When Huffman, former employee of Johnson's sole proprietorship, and current president and product manager of Storix, Inc., was asked in his deposition why he believes Storix, Inc. owns the copyright to software created prior to the formation of Storix, Inc., he responded: "I have no indication that would lead me to believe otherwise." (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr., Vol. 2, at 269:5-6.)  When Turner, also former employee of Johnson's sole proprietorship and product manager of Storix, Inc. from 2008 through 2014, was asked in his deposition why he believes Storix, Inc. owns the copyright, he responded the same way, stating: "I had no reason to believe that Storix, Inc. was not the owner of the copyright."  (Ex. 13 to Decl. Eastman,  Turner Dep. Tr., Vol. 2, at 109: 16-17; see also, Ex. 12 to Decl.

Eastman,  Altamirano Dep. Tr., Vol. 1, at 85: 2-15 [admitting that he has never seen a written document that identifies a written copyright transfer from Johnson to Storix, Inc)  Simply stating that "I had no reason to believe Storix, Inc. did not own the copyright" is a far cry from satisfying the strict writing requirements set forth under 17 U.S.C. § 204(a).

By operation of law, any rights granted by Johnson to Storix, Inc. concerning the Original Work can only be an implied, non-exclusive license.

### ii.      Johnson did not receive consideration foran irrevocable license.

At most, Storix, Inc. received an implied, non-exclusive license from Johnson to use his copyrighted material.  (*See*, *e.g.*, 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A][7] (Matthew Bender rev. ed. 2011) (explaining that non-exclusive licenses—which by definition are not transfers of copyright ownership—may be given orally or implied from consent).   The existence of a license is an affirmative defense to a claim of copyright infringement and the burden of proof is ultimately on the party seeking to avoid infringement liability. (*Worldwide Church of God v. Philadelphia Church of God, Inc*., 227 F.3d 1110, 1114 (9th Cir. 2000).)

Even if Storix, Inc. can prove it has an implied, non-exclusive license to the Original Work, the implied license is revocable at the discretion of Johnson because he did not receive any consideration for it.  (3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[B][5] (Matthew Bender rev. ed. 2011) ("It remains true that nonexclusive licenses are revocable absent consideration It therefore follows that they are irrevocable if supported by consideration."); *Ortiz v. Guitian Music Bros., Inc.*, No. 07 Civ. 3897, 2009 U.S. Dist. LEXIS 65191, *3 (S.D.N.Y. July 22, 2009) ("Indeed, absent consideration, nonexclusive licenses are revocable."); *Berster Tech., LLC. v. Christmas*, No. S-11-1541 KJM JFM, 2012 U.S. Dist. LEXIS 1950, *24-*26 (E.D. Cal. Jan. 6, 2012) (finding implied license that was not supported by consideration was revocable and had been revoked).)

State law dictates the sufficiency of consideration to support a finding of an

implied license.  (See, e.g., *Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003) (applying Texas law to determine adequacy of consideration for implied copyright license).) Under California law, adequate consideration is "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor ." (Cal. Civ. Code § 1605.)  Here, there was no consideration for an implied license to use Johnson's copyrighted materials from the Original Work to prepare and sell derivative works.

Storix, Inc. is claiming that Johnson received consideration at the time of formation of Storix, Inc. in 2003 "by receiving 100% of the issued shares in the corporation and the benefits associated with those shares, including control of the operations and corporate dividends/distributions." (Ex. 16 to Decl. Eastman, Bergmark report at p. 6.)  However, salary and distributions to an owner/employee of a company do not constitute consideration to create an irrevocable copyright license. (See *Nearstar, Inc. v. Waggoner*, 2011 U.S. Dist. LEXIS 20736, *10 (E.D. Tex. Mar. 2, 2011); see also, *Carson.*, 344 F.3d at 452 (at-will employment does not constitute sufficient consideration to support an irrevocable license).)  During his period of employment, Johnson received a salary and employee benefits just like all the other employees of Storix, Inc.  Johnson receives corporate dividends/distributions just like all the other officers and shareholders of Storix, Inc.  Further, the corporate dividends/distributions Johnson receives are based on the same per share calculation as every other shareholder of the company.

Storix, Inc. has not produced any evidence that Johnson received specific consideration from Storix, Inc. for an implied license at the time Johnson formed Storix, Inc. in 2003.  (Ex. 14 to Decl. Eastman,  Huffman Dep. Tr.,Vol. 2, at 271:21-25 through 272:23; 300:9-12 [admitting that he has no idea what the debt for "Note to Shareholder" appearing on the 2004 Storix, Inc. Annual Report was for/refers to]; see also, Ex. 13 to Decl. Eastman,  Turner Dep. Tr., Vol. 2, at 109: 6-11 [admitting

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(CASE NO. 14-CV-1873 H (BLM))

20

that he is not aware of any concession for the initial issuance of company shares other than the $1 par value]; Ex. 12 to Decl. Eastman,  Altamirano Dep. Tr., Vol. 1, at 73: 2-5 [admitting that he is not aware of any concession for the initial issuance of company shares other than the $1 par value].)  Storix, Inc.'s accounting records reflect that the value ascribed to the stock issued to Johnson in 2003 was $1,000, an amount which is the difference between the cash transferred to Storix, Inc. (an asset) and the note payable to Johnson by Storix, Inc. (a liability).  (Ex. 3 to Decl. Taylor, at p. 2.) The accounting records make no reference to "copyright" or "software" and the book value ascribed to Johnson's stock does not include any "copyright" or "software" value.  (Ex. 3 to Decl. Taylor, at p. 2.)

In this situation, there is no evidence to establish that Johnson received consideration to support an irrevocable license.  (See, e.g., *Nearstar, Inc. v. Waggoner*, 2011 U.S. Dist. LEXIS 20736, 2011 WL 817374, at *4 (E.D. Tex. Mar. 2, 2011) (license is revocable without specific consideration for the grant of a license).) Therefore, even if Storix, Inc. had an implied license, it was revocable, and Johnson revoked it as of July 22, 2014.  (Ex. 44 to Decl. Eastman.)  Accordingly, Storix, Inc. no longer has any permission to continue to use copyrighted materials from the Original Work to create or develop derivative works.

Moreover, even if, for argument purposes only, Johnson did grant Storix, Inc. a license and that grant of license was supported by specific consideration, Johnson still prevails on his copyright infringement claim because Storix, Inc. materially breached/exceed the scope of the purported license agreement.  The licensor's right of revocation arises where the breach "is of so material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties."  (*Rano v. Sipa Press, Inc*., 987 F.2d 580, 586 (9th Cir. Cal. 1993) (citation and quotation omitted, alterations in original).)  "After the agreement is terminated, any further distribution would constitute copyright infringement." (*Id*.)  In determining the scope of the license at issue, the license must be construed in accordance with the purposes underlying federal copyright law. (*Cohen v.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(CASE NO. 14-CV-1873 H (BLM))

21

*Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir. 1988).)  Chief among these purposes is the protection of the author's rights.  (Cohen, 845 F.2d at 854.)

Here, there is no writing addressing a transfer of copyright ownership or a license to use Johnson's copyrighted material between Storix, Inc. and Johnson.  Nor is an oral license agreement.  There is no evidence that Johnson even discussed the subject of a license with anyone from Storix, Inc.  The fact that Johnson allowed Storix, Inc. to use his copyrighted materials from the Original Work in the absence of any express use limitations, does not mean that Johnson transferred ownership of his copyright to Storix, Inc. or granted Storix, Inc. and unlimited and indefinite license to this copyrighted materials.  To hold otherwise would directly conflict with federal copyright policy.  (See, e.g., *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087-1088 (9th Cir. Cal. 1989) ("The district court applied the California rule that the contract should be interpreted against the drafter, thereby deeming S.O.S. to have granted to Payday any right which it did not expressly retain. This result is contrary to federal copyright policy:  copyright licenses are assumed to prohibit any use not authorized.") (internal citation omitted).)

Johnson could have assigned his copyright right in the Original Work to Storix, Inc. at any time.  However, he chose not to.  This was a conscious, deliberate decision by Johnson that cannot be chalked up to a mere oversight.  Johnson was familiar with the assignment process.  Indeed, he specifically assigned his federally registered trademark for "Storix Software" to Storix, Inc. in February 2006.  (Ex. 10 to Decl. Eastman.)  The fact that Johnson assigned his trademark to Storix, Inc. in 2006, yet did not assign the copyright at the same time, or at any time thereafter, is strong evidence that Johnson had no intention to assign and never did assign his copyrighted materials to Storix, Inc.

There clearly was no meeting of the minds regarding the scope of any purported license.  And there certainly is no evidence that Johnson granted Storix, Inc. irrevocable permission to use Johnson's copyrighted materials however they wanted and whenever they wanted and irrespective of Johnson's stated objections to

such use.  To allow Storix, Inc. the right to continue developing and selling derivative works that incorporate protected elements of the Original Work irrespective of Johnson's approval would defeat the very essence of Johnson's intentional decision to keep his copyright rights to the Original Work as his own personal property.  Accordingly, Storix, Inc.'s refusal to allow Johnson the right to control and manage the design of the software constitutes a material breach of any implied license it had to the Original Work because it deprived Johnson of his federally protected right to exclusively control the manner in which his copyrighted material is used.  Because Storix, Inc. no longer had a right to use copyrighted material from the Original Work, its continued preparation, publication, and sale of derivative works constitutes infringement of Johnson's copyright rights.

### iii.    Storix, Inc. cannot rely on equitable estoppel in defense.

"Equitable estoppel is disfavored and should only be applied as needed to avoid injustice."  (*Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1115 (C.D. Cal. 2010).)  To prevail on an estoppel defense, the defendant must prove the following four elements: "(1) the plaintiff knew of the defendant's allegedly infringing conduct; (2) the plaintiff intended that the defendant rely upon his conduct or act so that the defendant has a right to believe it is so intended; (3) the defendant is ignorant of the true facts; and (4) the defendant detrimentally relied upon the plaintiff's conduct."  (*Id.*)

Storix, Inc.'s equitable estoppel defense fails at least because it cannot establish detrimental reliance upon the implied license in the Original Work that Johnson later revoked.  From formation in February 2003 to September 2011, Johnson was the president, CEO, sole director, and sole shareholder of Storix, Inc. The employees at Storix, Inc. acknowledged that Johnson had complete creative control over his copyrighted material,  which necessarily included the ability to, at any given time, leave the company, sell his copyright, deny the continued used of his copyrighted materials, etc.  (Ex. 14 to Decl. Eastman, Huffman Dep. Tr., Vol. 2, at 270: 6-12.)  In view of this acknowledgement, Storix, Inc. cannot now claim to have

detrimentally relied upon any belief that Johnson would continue to allow the company to use his copyrighted materials indefinitely.  Moreover, Storix, Inc. also is precluded from claiming detrimental reliance in light of the fact Huffman, Turner, Altamirano, and Kinney each signed the stock transfer agreement in 2011—which made no mention of any copyright being transferred from Johnson to Storix, Inc.— yet nobody made any effort to investigate or conduct any due diligence whatsoever with respect to whether the 2011 stock transfer agreement included Johnson's copyright.  (Ex. 12 to Decl. Eastman, Altamirano Dep. Tr., Vol. 1, at 84: 13-16.) There is no evidence sufficient to prove that Storix, Inc. reasonably relied to its detriment on a belief that it would always retain rights to use Johnson's copyrighted material in the Original Work, even without Johnson's approval or authorization.

It is undisputed that Storix, Inc. is in the process of preparing the infringing derivative work, SBA version 9.1, which it hopes to release by the end of 2015.  (Ex. 15 to Decl. Eastman,  Kinney Dep. Tr., Vol. 1, at 115: 10 through 117: 15; Ex. 7 to Decl. Eastman, Hawkins Dep. Tr., Vol. 1, at 93: 10-14.)  Remarkably, SBA version 9.1 includes the very network and data encryption features that Johnson demanded to be implemented back in 2014.  (Ex. 15 to Decl. Eastman,  Kinney Dep. Tr., Vol. 1, at 115: 10 through 117: 15; Ex. 38 to Decl. Eastman, Hawkins Dep. Tr., Vol. 1, at 83: 6 through 85: 9.)  At the time Johnson resigned, he was currently working on SBA version 9.1.  (Ex. 37 to Decl. Eastman.)  After Johnson resigned, Storix, Inc. hired a new software programmer, Reuben Hawkins, to finish what Johnson had started. (Ex. 38 to Decl. Eastman, Hawkins Dep. Tr., Vol. 1, at 85: 3-9.)  Hawkins admitted during his deposition that he reviewed Johnson's SBA version 9.1, and then just "re-wrote" it.   (Ex. 38 to Decl. Eastman, Hawkins Dep. Tr., Vol. 1, at 96: 25 thru 97: 8.)

Storix, Inc. board members went to great lengths to force Johnson out of the company.  Storix, Inc. recognized that the current software (SBA version 8.2) is vulnerable to network security threats back in 2013 and they decided that in 2014 they would begin working on fundamental changes to the network security of the software.  (Ex. 36 to Decl. Eastman, at STORIX231287.)  Throughout 2014 Johnson,

and only Johnson, spent months creating, testing, and developing enhanced network and data security features which the company referred to as version 9.1.  (Ex. 43 to Decl. Eastman.)  Then when Johnson was ready to start integrating his new network security features with the software, the Storix, Inc. board members refused to allow him to do so, claiming that those features were no longer necessary.  (Ex. 43 to Decl. Eastman.)  Yet, immediately after Johnson resigned from the company, Storix, Inc. hired a new employee to come in, review Johnson's version 9.1 and finish what Johnson started.  (Ex. 38 to Decl. Eastman, Hawkins Dep. Tr., Vol. 1, at 85: 3-9; 96: 25 through 97: 8.)  The only reasonable explanation for the board member's actions is that they wanted to continue exploiting Johnson's copyrighted material for their own personal gain, but they did not want to work with Johnson any longer.  Indeed, the Storix, Inc. board members have gone to great lengths to prevent Johnson from ever returning to the company.  (Ex. 50 and 51 to Decl. Eastman.)  Equity does not support the Storix, Inc. board members' systematic and deliberate acts of oppression and harassment against Johnson for the purpose of squeezing him from the company.

## V.     CONCLUSION

This Court should must summary judgment on copyright infringement because there is no genuine dispute that: Johnson's copyright to SBA version 1.3 is valid and enforceable; Johnson is the current owner of the registered copyright; and Storix, Inc. is selling an unauthorized derivative work that incorporates protected elements from version 1.3.  Further, as the prevailing party, Johnson is entitled to costs and he should be awarded reasonable attorneys' fees under 17 U.S.C. § 505 in light of Storix, Inc.'s assertion of objectively unreasonable defenses and in furtherance of the goals of compensation and deterrence.

DATED: October 2, 2015                 EASTMAN & MCCARTNEY LLP


                                       By:  /s/ Gary L. Eastman
                                            Gary L. Eastman, Esq.
                                            Attorneys for Plaintiff/Counterclaim-
                                            Defendant ANTHONY JOHNSON

---

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned certify and declare as follows:

I am over the age of eighteen years and not a party to this action.  My business address is 401 West A Street, Suite 1785, San Diego, California, 92101, which is located in the county where the service described below took place.

On October 2, 2015, at my place of business in San Diego, California, I served a copy of the following document:

**POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Via the CM/ECF FILING SYSTEM.  The undersigned hereby certifies that he caused a copy of the foregoing documents to be filed with the clerk of the U.S. District Court, Southern District of California, using the CM/ECF filing system, which caused a copy to be electronically mailed to the following CM/ECF Participant(s) noted below:

Paul A. Tyrell (Bar No. 193798)
E-mail:  paul.tyrell@procopio.com
Sean M. Sullivan (Bar No. 254372)
E-mail:  sean.sullivan@procopio.com
PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA  92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Defendant/Counterclaimant
Storix, Inc., a California corporation

I certify and declare under penalty of perjury under the laws of the United States of American and the State of California that the foregoing is true and correct.

Executed on October 2, 2015, in San Diego, California.

By:      /s/ Gary Eastman
Gary Eastman

Certificate of Service